IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RENE CAMPOS,                          §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §        CIVIL NO. H-07-4396
                                      §
MICHAEL ASTRUE,                       §
COMMISSIONER OF THE                   §
SOCIAL SECURITY ADMINISTRATION,       §
                                      §
        Defendant.                    §

**MEMORANDUM OPINION**

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 13) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 15).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g)for judicial review of a partially unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability benefits under Title II[2] of the Social Security Act ("the Act").

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry No. 16.

[2]     Plaintiff's Complaint states that he applied for disability insurance benefits under Title II and supplemental security income under Title XVI, but his application indicates that he only applied for benefits under Title II.  Tr. 55; see also Tr. 15, 26, 27, 194.

## A.   <u>Factual History</u>

Plaintiff was born on October 17, 1951, and was fifty-one years old on the date of the onset of disability.[3]  Plaintiff completed high school and one year of college in Mexico and worked as a machinist for eighteen years.[4]   Plaintiff is able to communicate in English.[5]

On January 6, 2003, Plaintiff underwent surgery on his left shoulder to address subacromial impingement syndrome and adhesive capsulitis.[6] Doan Khac Nguyen, M.D., ("Dr. Nguyen"), who performed the surgery, noted that Plaintiff tolerated the procedure well and experienced no complications.[7]  Pain gradually decreased over the next several months, during which time, Plaintiff attended some of the prescribed therapy sessions.[8]  On his last visit to Dr. Nguyen, which was on June 19, 2003, he reported improvement in pain, but continued stiffness.[9]   In July 2003, Plaintiff was taking no medication for pain.[10]

---

[3]      <u>See</u> Transcript of the Administrative Proceedings ("Tr.") 55.

[4]      Tr. 62, 67, 70, 195.

[5]      Tr. 60, 195, 196.

[6]      <u>See</u> Tr. 94.

[7]      Tr. 95.

[8]      <u>See</u> Tr. 100-01.

[9]      <u>See</u> Tr. 99, 100

[10]      <u>See</u> Tr. 66.

Shortly thereafter, Plaintiff sought treatment for pain in his right shoulder.[11]   Anil Dutta, M.D., ("Dr. Dutta") and Plinio Caldera, M.D., ("Dr. Caldera") both treated Plaintiff for right shoulder pain.[12]   Following many months of conservative treatment, Plaintiff underwent surgery on his right shoulder on March 11, 2004.[13]   Treatment notes from the first few months post-surgery indicate that he was improving, although he continued to have some pain.[14]   Plaintiff met his therapeutic rehabilitation potential in July 2004 and was discharged from physical therapy.[15]   Following a recovery period after each surgery, Dr. Dutta cleared Plaintiff for light-duty work.[16]

Just before completing the rehabilitation on his right shoulder, Plaintiff began receiving treatment for bilateral knee pain.[17]   In October 2004, Stefan Kreuzer, M.D., ("Dr. Kreuzer") performed arthroscopic surgery on Plaintiff's left knee.[18]   Just a few months later, Plaintiff underwent a fourth surgery, the second

---

[11]   See Tr. 108-11, 128-29, 132, 134, 136-37.

[12]   See id.

[13]   See id.; Tr. 155, 163-64.

[14]   See Tr. 157-60.

[15]   See Tr. 165.

[16]   See Tr. 131, 133, 134, 154, 158, 159.

[17]   See Tr. 161, 170.

[18]   See Tr. 19, 161, 171, 175.  The operative report and postoperative treatment notes for this surgery are not in the administrative record.

on his left shoulder.[19]  The surgery involved arthroscopic lysis of adhesions, distal clavicle resection, and revision subacromial decompression.[20]  Immediately prior to surgery, Plaintiff was not taking any prescribed pain medication, but took anti-inflammatory and pain medications postoperatively.[21]  Dr. Dutta also prescribed several weeks of rehabilitative therapy following the January 2005 surgery.[22]

On July 8, 2005, John Anigbogu, M.D., ("Dr. Anigbogu") examined Plaintiff.[23]  Plaintiff complained of pain and stiffness in his shoulders, knees, and lower back.[24]  Dr. Anigbogu ordered a laboratory test for rheumatoid factor, multiple x-rays, and a magnetic resonance imaging scan (MRI).[25]  The rheumatoid-factor test was negative.[26]  After interviewing Plaintiff, examining him, and reviewing the objective medical data, Dr. Anigbogu assessed Plaintiff's functional capacity:  "He is independent with bed mobility, transfer and dressing.  Ambulates independently with

---

[19]    See Tr. 150, 174, 175.  The operative report and postoperative treatment notes for this surgery are not in the administrative record.

[20]    Tr. 175.

[21]    See Tr. 151, 175.

[22]    See Tr. 175.

[23]    See Tr. 177-179.

[24]    Tr. 177.

[25]    See Tr. 180-83.

[26]    See Tr. 183.

antalgic gait.  His sitting and standing balance is good.  Able to heel and toe walk, partial squat and hop."[27]

**B.  Procedural History**

Plaintiff filed for disability benefits on July 31, 2003, claiming an inability to work since January 6, 2003, due to adhesive capsulitis in both shoulders.[28]  The Commissioner denied Plaintiff's application at the initial and reconsideration levels.[29] Plaintiff completed reports in August and October 2003, detailing his daily activities and limitations.[30]  During the initial-and-reconsideration review process, two residual functioning capacity ("RFC") assessments were completed by medical consultants.[31]

In February 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[32]  The ALJ granted Plaintiff's request and conducted

---

[27]    Tr. 178.

[28]    See Tr. 39, 55, 57.  The Disability Report dated July 31, 2003, identifies his disabling conditions as hypertension and rheumatoid arthritis. See Tr. 61.  However, Plaintiff characterized that notation as a misunderstanding when he requested a hearing, stating instead that adhesive capsulitis in his shoulders caused his inability to work.  See Tr. 39.

[29]    See Tr. 26-32, 35-38.

[30]    See Tr. 78-80.

[31]    See Tr. 112-19, 142-49.

[32]    See Tr. 39-40.

5

a hearing on April 19, 2005.[33]  At the hearing, Plaintiff and a vocational expert testified.[34]

Plaintiff explained that he still had pain in his shoulders when lifting his arms above his head.[35]  Plaintiff stated that he could lift ten pounds and carry a small bag of groceries, but could not swing a hammer overhead or push a lawnmower.[36]  Although he reported having pain daily and nightly, he stated that he did not take any sort of pain medication and relied on therapy to relieve his pain.[37]

Plaintiff claimed that he had been diagnosed with rheumatoid arthritis, which affected his knees and back and limited his ability to bend and stand.[38]  For arthritis pain, Plaintiff had taken anti-inflammatory medication for a period of time, but the doctor stopped prescribing it.[39]

Plaintiff listed the surgeries that he previously had undergone on his shoulders and his left knee and stated that he and his physician were contemplating surgery on his right knee.[40]  As

---

[33]    See Tr. 41-42, 46-50, 192-226.

[34]    See Tr. 192-226.

[35]    Tr. 198.

[36]    Tr. 199-200.

[37]    See Tr. 202-03.

[38]    Tr. 204-05, 216.

[39]    Tr. 204.

[40]    Tr. 197, 198, 205-06.

6

far as Plaintiff's limitations caused by pain in his knees, he said that he could stand for one and one-half hours before needing a thirty-minute break, but estimated that he could stand for a total of only two to three hours in an entire workday.[41]   He also estimated that he could walk "[p]robably half a mile or less" before taking a forty-five minute break.[42]   According to Plaintiff, his knees swelled after walking half a mile or ascending a flight of stairs.[43]   Sitting was limited to forty-five minute increments as well, Plaintiff testified.[44]

With regard to his back pain, Plaintiff stated that he had difficulty sitting for long periods and bending or stooping and that he was experiencing spasms in his right leg.[45]   He said that a back x-ray was scheduled for the day after the hearing.[46] Plaintiff reported needing to lie down for an hour or more every two or three hours.[47]

During the day, Plaintiff said, he read, watched television, watched his son play baseball, drove in increments of thirty

---

[41]   Tr. 206-08.

[42]   Tr. 208-09.

[43]   Tr. 210.

[44]   Tr. 211.

[45]   Tr. 211-13.

[46]   Tr. 212.

[47]   Tr. 214.

minutes or less, but did not cook, perform housework, or socialize.[48]

The vocational expert testified that Plaintiff's job as a machinist was a skilled position requiring a medium level of exertion.[49] He explained that Plaintiff would have acquired transferable skills for work at the light exertional level where the worker was able to alternate sitting and standing at will.[50] The ALJ asked hypothetically if a fifty-three-year-old person with a high-school education in Mexico with basic English proficiency, who could perform work at the light level of exertion with a sit/stand option, but could not perform work with his hands above his shoulders, would be able to find substantial gainful employment.[51] The vocational expert answered in the affirmative and cited drill press operator, coil winder, motor rewinder, all semi-skilled positions requiring light exertion, as examples.[52] Those jobs would not require more than occasional bending, squatting, or stooping.[53] Someone who had to take ten-minute breaks every hour or had to take two twenty-minute unscheduled breaks to lie down or

---

[48]    Tr. 214-16.

[49]    Tr. 217.

[50]    Id.

[51]    Tr. 217-18

[52]    Tr. 218-19.

[53]    Tr. 219, 222.

raise his legs would not be able to perform those jobs, according to the vocational expert.[54]

As far as sedentary work with a sit/stand option, the vocational expert opined that Plaintiff had no transferable skills, but could work as a surveillance monitor, an optical goods worker, or a hand packager.[55]  If Plaintiff were not able to bend, to squat, or to remain sitting for more than forty-five minutes, he would not be able to perform the cited sedentary jobs.[56]

Dr. Anigbogu's consultative examination occurred several months after the hearing; at which time, he also completed an assessment of Plaintiff's limitations.[57]  Dr. Anigbogu opined that Plaintiff was capable of lifting and/or carrying twenty pounds frequently, standing and/or walking about six hours in an eight-hour workday, but needed to periodically alternate between sitting and standing to relieve pain and was limited in his ability to push and/or pull with his upper or lower extremities.[58]  Plaintiff was capable of occasionally climbing, balancing, kneeling, crouching, crawling, and stooping, according to Dr. Anigbogu.[59]  Although he

---

[54]     Tr. 223.

[55]     Tr. 220.

[56]     Id.

[57]     See Tr. 177-79, 184-87.  Two copies of Dr. Anigbogu's assessment are in the record.  See also Tr. 188-91.

[58]     Tr. 184-85.

[59]     Tr. 185.

found Plaintiff's ability unlimited in the areas of gross manipulation, fine manipulation, and skin receptors, Dr. Anigbogu indicated that Plaintiff only frequently, not constantly, could reach.[60]  Dr. Anigbogu assessed Plaintiff as having no visual or communicative limitations and only one environmental limitation (vibration).[61]

## B.  ALJ's Decision

On August 9, 2006, the ALJ issued his decision finding that Plaintiff met the requirements for insured status on the alleged onset date of disability and continuing through December 31, 2008.[62] In a partially favorable decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period and that he had a combination of impairments ("discogenic and degenerative disorders of the spine, residual pain from left and right shoulder acromioplasties, residual pain from left knee arthroscopy") that was severe.[63]  The ALJ noted that, despite Plaintiff's assertion at the hearing that he was diagnosed with rheumatoid arthritis in 1998, two laboratory reports in the medical record both were negative for the rheumatoid factor.[64]

---

[60]    Tr. 186.

[61]    See Tr. 186-87.

[62]    See Tr. 15-24.

[63]    See Tr. 15, 18.

[64]    Tr. 21.

The ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or equal any medical listing in the regulations (the "Listings"),[65] in particular, Listings 1.02 and 1.04.[66] Finding Plaintiff's statements about his limitations to be consistent with objective medical evidence for the time period January 6, 2003, through July 7, 2005, the ALJ concluded that Plaintiff was unable to perform the requirements of a sedentary level of work because he was unable to lift ten pounds on a frequent basis and because he needed a sit/stand option.[67] The ALJ determined that Plaintiff's residual functional capacity ("RFC") prevented him from performing his past relevant work or other work for that time period.[68]

Although the ALJ found Plaintiff disabled within the meaning of the Act for those two and one-half years, he determined that Plaintiff experienced medical improvement related to his ability to work on July 8, 2005.[69] Thus, the ALJ awarded benefits for the closed period January 6, 2003, to July 7, 2005, only.[70]

---

[65]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[66]    See Tr. 19, 21-22.

[67]    See Tr. 19, 21.

[68]    See Tr. 20.

[69]    See Tr. 15, 21.

[70]    See Tr. 15, 24.

The ALJ made the following findings regarding Plaintiff's condition after July 7, 2005:

> The claimant experienced medical improvement after his January 2005 surgery to revise the previous sub-acromial decompression and to address the post-surgical scarring. He had already experienced a successful right shoulder surgery, as he had told Dr. Nguyen that he was very happy with his progress[] and had concluded physical therapy with very positive results.  Dr. Dutta's surgery for the claimant's right shoulder went as planned, with excellent results.  The knee surgery had similar results.[71]

The ALJ cited Dr. Anigbogu's treatment notes from a July 8, 2005, evaluation as evidence of improvement.[72]  Based on Dr. Anigbogu's conclusions, the ALJ determined that, after July 8, 2005, Plaintiff had the RFC to lift and/or carry twenty pounds occasionally, to lift and/or carry ten pounds frequently, to work in an environment with a sit/stand option, but that he must continue to avoid working with his arms raised above shoulder level.[73]

The ALJ found Plaintiff's alleged symptoms to be supported by the medical evidence, but, beginning on July 8, 2005, not to the degree of "intensity, persistence, and limiting effects" claimed by Plaintiff.[74]  Specifically, the ALJ noted, "The claimant's description of his very high level of pain is inconsistent with the medications he is prescribed and his activities, including driving,

---

[71]    Tr. 21.

[72]    See Tr. 21.

[73]    See Tr. 22.

[74]    See Tr. 23.

taking care of personal needs, watching television and reading."[75]
As a result, the ALJ found that Plaintiff's RFC increased to a
level that, in combination with the transferable skills acquired
from his past work experience, allowed him to perform a limited
range of light, unskilled jobs.[76]   Relying on the vocational
expert's testimony, the ALJ determined that Plaintiff could perform
jobs such as drill press operator, coil winder, and motor re-
winder, jobs that are sufficiently available in the regional
economy.[77]

   In late August, Plaintiff appealed the ALJ's decision and
requested an extension of time to review the hearing tapes and file
a brief.[78]   After allowing Plaintiff until August 14, 2007, to
submit additional information, the Appeals Council denied his
request for review on October 5, 2007, thereby making the ALJ's
decision the final decision of the Social Security Administration.[79]

## II.  Standard of Review and Applicable Law

   The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) substantial evidence in the record supports the

---

[75]   Id.

[76]   See Tr. 23-24.

[77]   See Tr. 24.

[78]   See Tr. 10.

[79]   Tr. 4-6, 7.

decision; and 2) the ALJ applied proper legal standards in evaluating the evidence. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In addition to the initial disability determination, the Social Security Administration periodically reviews continued entitlement to disability benefits. See 20 C.F.R. § 404.1594(a).

**A.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown, 192 F.3d at 496. In other words,

14

the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

## B.  <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of

15

performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498.  If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

## C.  Continuing Entitlement

When determining whether disability benefits continue, the Commissioner must determine whether substantial evidence supports a finding of medical improvement in the claimant's impairment, and, if so, whether this medical improvement is related to the claimant's ability to work.  20 C.F.R. § 404.1594(a); see also 42 U.S.C. § 423(f); Griego v. Sullivan, 940 F.2d 942, 943-44 (5th Cir. 1991).  The regulations define medical improvement as "any decrease in the medical severity" of the impairments that were present at

the time of the most recent finding of disability or continued disability.  20 C.F.R. § 404.1594(b)(1).

In determining whether medical improvement is related to the claimant's ability to do work, the Commissioner will compare both the medical severity of the impairment and the claimant's RFC at the time of claimant's last favorable medical decision with his current condition.  20 C.F.R. §§ 404.1594(b)(7), (c)(2). Ultimately, the ALJ must decide whether medical improvement has occurred that is related to the claimant's ability to work.  20 C.F.R. §§ 404.1594(a), (c)(2).  The regulations outline eight steps to follow in making the determination whether disability continues. See 20 C.F.R. § 404.1594(f).  The steps include reassessing whether:  the claimant is engaged in substantial gainful activity; the claimant has experienced a decrease in medical severity; the claimant has experienced medical improvement related to the claimant's ability to perform work; certain enumerated exceptions apply to terminate benefits even if medical improvement has not occurred; and the claimant's improved RFC would allow him to perform his past relevant work or other work.  Id.

### III.  Analysis

Plaintiff requests judicial review of the ALJ's partially favorable decision granting disability benefits for a closed period.  Plaintiff contends that the decision to cease benefits in July 2005 is not supported by substantial evidence and that the ALJ

17

did not follow proper legal procedures.  Specifically, Plaintiff argues that the ALJ erred in his application of the medical-improvement standard, erred in finding that Plaintiff did not meet a listing, and erred in the RFC determination.  The Plaintiff also contends that the administrative record is incomplete, noting that the record does not contain medical records, to which the ALJ cited in his opinion,[80] concerning Plaintiff's knee surgery.  Plaintiff speculates that "other records are missing as well," but does not identify what records or their content.[81]

Taking the last issue first, the court agrees that the record lacks operative reports and postoperative treatment notes from either Plaintiff's October 2004 left knee surgery or his January 2005 left shoulder surgery.  Also, a medical time line that was submitted at the hearing references pages three through seven of exhibit 8F, which are not included in the administrative record as it appears before this court.  According to the time line, these

---

[80]    Citing to page nineteen of the administrative record, Plaintiff points to the portion of the ALJ's opinion that states "After the claimant recovered somewhat from the knee surgery . . . . ." as an indication that the record before the ALJ contained additional medical notations not in the administrative record before the court.  See Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 3.  The court cannot pinpoint where the ALJ found information supporting that particular phrase, but notes that the record does contain evidence of the sequence of surgeries, providing at least a general time frame for each, and a functional assessment by Dr. Dutta that serves as the source of the remainder of the ALJ's sentence.  See Tr. 150, 161, 171, 174, 175.  Additionally, a note by Dr. Dutta prior to Plaintiff's knee surgery generally supports the ALJ's statement.  See Tr. 161. (stating that Plaintiff should have arthroscopic knee surgery before addressing the recurring problems with his left shoulder).

[81]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 3.

records relate, in part, to pre-surgical treatment of Plaintiff's bilateral knee pain.[82]

Despite the void in the medical records, the court finds sufficient evidence to support the ALJ's decision.  The ALJ acknowledged both the October 2004 knee surgery and the January 2005 shoulder surgery and determined that Plaintiff remained entitled to disability benefits while in recovery from those surgeries.  The ALJ's medical-improvement determination would not be altered by the medical records that appear to be missing because the ALJ based that decision on the results of a consultative examination performed in July 2005, six months after Plaintiff's last surgery.  Any medical information contemporaneous with his last two surgeries or with Plaintiff's recovery period would not be relevant to Plaintiff's post-recovery condition or whether he experienced medical improvement six months after his last surgery.

Returning to Plaintiff's challenges to the ALJ's opinion, the court begins with the assertion that the ALJ did not follow the requirements of the regulations with regard to determining whether Plaintiff experienced medical improvement.  Plaintiff complains that the ALJ did not analyze how the improvement in severity experienced by Plaintiff impacted his ability to work or improved his RFC, stating that the ALJ failed to cite any objective medical evidence.

---

[82]    See Tr. 170.

Although the regulations contain fairly detailed steps for this process, they do not require that the ALJ articulate his analysis at each step. See 20 C.F.R. § 404.1594(f). In this case, the ALJ did not specifically address each of the steps in the medical improvement analysis, but did proceed through the analysis in an organized and thorough fashion.

In finding medical improvement, the ALJ relied largely on the results of the consultative examination on July 7, 2005.[83] He wrote, "As evidence of the success of the revision, Dr. Anigbogu evaluated the claimant after he had an opportunity to heal fully[] and found him capable of performing work at the level described in his medical source statement."[84] Following a discussion of Listings 1.02 and 1.04, the ALJ explicitly adopted the RFC findings of Dr. Anigbogu,[85] which provide substantial evidence in support of the ALJ's decision.

In sum, the ALJ found that Plaintiff's impairments had become less severe, but continued to qualify as severe, that the improvement affected his ability to perform work activities, and that his RFC improved to the degree described by Dr. Anigbogu. The ALJ completed his analysis by determining that Plaintiff's new RFC would not allow him to perform his past relevant work, but, in

---

[83]   See Tr. 21.

[84]   Id. (citation omitted).

[85]   Tr. 23.

20

combination with his transferable skills, would allow him to perform other work available in significant numbers in the national economy.  The ALJ based the last conclusion on the testimony of the vocational expert to whom the ALJ presented a hypothetical question involving an individual with abilities consistent with those of which Dr. Anigbogu found Plaintiff capable.[86]  The ALJ was not required to follow the regulations any more closely in his written decision and did not commit any error in his analysis.

Plaintiff also challenges the ALJ's finding that Plaintiff did not meet Listing 1.02.  As the court understands Plaintiff's argument, he believes that the ALJ should have found that he suffered from "debilitating pain," equivalent to the requirements of the listing.[87]

Listing 1.02 requires "chronic joint pain and stiffness with signs of limitation of motion."  In discussing this listing, the ALJ acknowledged that Plaintiff suffered from reduced strength in his shoulders and reduced range of motion.[88] However, he also found that Plaintiff's daily activities and Dr. Anigbogu's assessment suggested that Plaintiff did not have an "extreme loss of function of both upper extremities" such that his impairments "interfere[d] very seriously with [his] ability to independently initiate,

---

[86]    See Tr. 24, 217-18.

[87]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 13.

[88]    See Tr. 22.

sustain, or complete activities."[89]   The ALJ also doubted Plaintiff's allegations with regard to the severity of his pain: "The claimant's description of his very high level of pain is inconsistent with the medications he is prescribed and his activities . . . ."[90]

Plaintiff complains that no medical expert testified at the hearing and suggests that, if the ALJ had any question about Plaintiff's pain, he should have requested an updated medical opinion.  In fact, Dr. Anigbogu's consultative examination and RFC assessment occurred three months after the hearing.  As the ALJ relied on Dr. Anigbogu's opinion in finding that Plaintiff had experienced medical improvement as of the date of the examination, a more up-to-date opinion was not only unnecessary, but also unattainable.

Focusing on his allegations of pain, Plaintiff contends that, even if his symptoms did not meet or equal Listing 1.02, the ALJ did not perform a correct analysis of Plaintiff's RFC.  Plaintiff insists that, had the ALJ properly assessed what Plaintiff could do despite his impairments, the ALJ would have found Plaintiff's exertional capacity to be less than sedentary.  Plaintiff contends

---

[89]   Tr. 21-22.

[90]   Tr. 23.

that the frequency of treatment and the physician's opinions regarding Plaintiff's pain support his position.[91]

Pain can constitute a disabling impairment. See Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985).  However, "the mere existence of pain is not an automatic ground for obtaining disability benefits." Fortenberry v. Harris, 612 F.2d 947, 950 (5th Cir. 1980).  Only when pain is "constant, unremitting, and wholly unresponsive to therapeutic treatment" can it be considered disabling.  Selders, 914 F.2d at 618-19 (quoting Harrell v. Bowen, 862 F.2d 471, 480 (5th Cir. 1988)).  The ALJ is required to consider subjective evidence of pain along with other record evidence, but is ultimately responsible for making the determination of whether the pain is debilitating.  Wren, 925 F.2d at 128.

Despite Plaintiff's assertions to the contrary, the record does not indicate that Plaintiff received treatment with such regularity after July 7, 2005, as to interfere with work.  Also in contrast to Plaintiff's contentions, Plaintiff's physicians did not opine that Plaintiff suffered from debilitating pain.  As noted by the ALJ, they did not prescribe Plaintiff pain medication except during the recovery periods immediately following surgery.  In fact, Dr. Dutta cleared Plaintiff for light duty multiple times after his various surgeries.

---

[91]     Plaintiff also mentions "the severity and symptoms of Plaintiff's cognitive impairments."  Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 15.  Unless this is a reference to pain, this statement has no support in the medical record.

The ALJ did not err in finding that Plaintiff's allegations of pain were not supported to the degree claimed.  Plaintiff reported that he did not take prescribed pain medication and that he relied on therapy to relieve pain.  He also engaged in activities, such as walking for exercise and driving, that are inconsistent with a great degree of pain.

Plaintiff is not entitled to summary judgment.  Defendant also moves for summary judgment.  Having found that the ALJ's decision contains no legal error and is supported by substantial evidence, the court finds that Defendant's summary judgment motion should be granted.

### IV.   Conclusion

Based on the foregoing, the court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion.

**SIGNED** in Houston, Texas, this 6th day of January, 2009.

_____
Nancy K. Johnson
United States Magistrate Judge

24